UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

**UNITED STATES OF AMERICA,**

v.                                              Case No.:    3:19cr113/MCR

**KADEEM INGRAM and
KENNETH INGRAM**
_____/

## ORDER

This matter is before the Court on separate motions to suppress filed by Defendants Kadeem and Kenneth Ingram.[1]  *See* ECF Nos. 182, 183.  An evidentiary hearing was conducted on October 15, 2020.  Having fully considered the evidence, the applicable law, and the parties' written and oral arguments, the Court finds that both motions are due to be denied.

---

[1] Defendant Kenneth Ingram is Defendant Kadeem Ingram's father.  The Ingrams, along with three additional co-defendants, are charged in a nine-count indictment with various drug trafficking offenses.  More specifically, both Ingrams are charged with one count of conspiring to distribute and possess with intent to distribute 500 grams or more of cocaine and 28 grams or more of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(ii), and 841(b)(1)(B)(iii); and one count of possessing with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(ii).  Kadeem Ingram is also charged with two counts of distributing cocaine and cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).  Co-defendants Terrell Burdette, Sidney McGhee, and Francis Muldowney are also charged with a drug trafficking conspiracy.  *See* Indictment, ECF No. 3.  In addition, Burdette is charged with five counts of distributing cocaine and crack.  *See id.*  The three co-defendants have all pled guilty.

## I.    Factual Findings[2]

In January 2019, the Drug Enforcement Agency ("DEA") and the Walton County Sheriff's Office Narcotics Unit ("Sheriff's Office"), together, began investigating a drug trafficking network operating in and around Walton County, Florida.  Through a combination of confidential informants, controlled purchases, physical and video surveillance, and telephone toll records analysis, Kadeem and Kenneth Ingram were identified as members of that network.  During the investigation, the DEA obtained court-authorization to intercept wire and electronic communications for Kadeem Ingram's two cell phones, as well as the phones' GPS and location data, and also for co-defendant Terrell Burdette's cell phone.  Among the hundreds of calls and texts intercepted to and from those phones were numerous conversations in which Kadeem and Kenneth Ingram, and others, discussed drug trafficking activities.  *See, e.g.*, Gov. Exh. 1-4.  The interceptions, surveillance, and geolocation data also revealed that, every two to four weeks, the Ingrams were renting a vehicle from Enterprise Rent-A-Car in Crestview, Florida, traveling in the rental vehicle to Miami, Florida, and returning with kilogram quantities of cocaine, which they then distributed in and around Walton County.[3]  The Ingrams made this trip on six separate occasions between March 7, 2019 and July 13, 2019.

---

[2] The following findings of fact are based on the undisputed evidence presented at the suppression hearing.

[3] Kenneth Ingram rented the vehicle.  Kadeem Ingram drove the vehicle.

Case No. 3:19cr113/MCR

On July 10, 2019, a series of intercepted telephone calls and texts revealed that the Ingrams were planning to rent another vehicle, pack some clothes, gather the money to "re-up" their supply of cocaine, travel to Miami to obtain the cocaine, and return with it to DeFuniak Springs, Florida.[4] That same day, law enforcement observed the Ingrams enter the Enterprise Rent-A-Car in Crestview, rent a white Toyota Camry with Colorado tags and, thereafter, travel east on Interstate 10. In the early morning hours of July 11, 2019, geolocation data for Kadeem Ingram's phone established that the phone had travelled via Interstate 10 from DeFuniak Springs to the Miami area, where it remained for the next two days.

Mid-morning on July 13, 2019, geolocation data for Kadeem Ingram's phone showed the phone travelling north from Miami on Interstate 75, and then west along Interstate 10 towards DeFuniak Springs. Around that same time, the DEA intercepted text messages from Kadeem Ingram's phone in which he told his girlfriend that he was headed back to Walton County. Based on this information, members of the DEA and the Sheriff's Office—including DEA Special Agent Kevin Miller, and Sheriff's Deputies Damon Byrd and Steven Tector, both of whom were canine units—established surveillance on Highway 81 and along Interstate 10 from the Gadsden County Rest Area to DeFuniak Springs. All members of the

---

[4] According to Special Agent Kevin Miller, the term "re-up" refers to obtaining a fresh supply of cocaine.

surveillance team were told that the vehicle would be driven by Kadeem Ingram and was believed to be carrying a substantial amount of cocaine.

During the surveillance, Special Agent Miller observed the white, rental Camry with Colorado plates travelling on Interstate 10. Kadeem Ingram was driving the vehicle and Kenneth Ingram was seated in the front passenger seat. Special Agent Miller radioed this information to the other members of the surveillance team, including Deputy Byrd, and directed them to follow the vehicle, find a valid legal traffic violation, initiate a traffic stop, conduct a dog sniff and, if the dog alerted, to search the Ingrams' vehicle.

Around 6:50 p.m., Deputy Byrd saw the Ingram's Camry cross the Walton County line on Interstate 10 and, thereafter, the deputy fell in behind the vehicle and monitored its speed with his radar. Just after Deputy Byrd's radar clocked the vehicle's speed at 83 mph in a 70 mph zone, he observed the vehicle abruptly change lanes and cut off another car. He immediately activated his emergency lights and sirens to initiate a traffic stop. The Camry complied and pulled to a stop on the right shoulder of the roadway. Deputy Byrd then radioed dispatch with the stop location, type of vehicle, and number of vehicle occupants. The other members of the surveillance team could hear Deputy's Byrd's radio call and Deputy Tector responded that he was en route to provide back up.

Deputy Byrd approached the Ingrams' vehicle, advised the two occupants of the reasons for the stop, and obtained their driver's licenses and a copy of the car rental agreement. He then returned to his vehicle and began checking the validity of the licenses and rental agreement through dispatch. While Deputy Byrd awaited a response from dispatch, he saw Deputy Tector arrive on scene and ask the Ingrams to exit their vehicle. Both Ingrams complied. However, according to Deputy Byrd, Kadeem Ingram "clinch[ed] his jaw" and "flared his chest" in a "very aggressive" manner while doing so. Based on his law enforcement experience, Deputy Byrd "firmly believe[d]" this behavior indicated Kadeem Ingram was preparing to "either run or fight with Deputy Tector." Deputy Byrd thus exited his vehicle and stood with the Ingrams for officer safety while Deputy Tector conducted the dog sniff. At this point, the Ingrams were not handcuffed and dispatch had not yet reported back on the validity of driver's license and vehicle information.

Deputy Tector then performed a free air dog sniff around the exterior of the Ingram's vehicle using his assigned canine, after which, he advised Deputy Byrd that the dog alerted to the presence of illegal narcotics.[5] Both of the Ingrams became "very upset" and began yelling that the dog did not alert to their vehicle. Deputy

---

[5] Deputy Tector did not testify at the evidentiary hearing. Instead, Deputy Byrd—who did not personally observe the dog's alert—testified about what Deputy Tector told him. *See United States v. Raddatz*, 447 U.S. 667, 679 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial."); *United States v. Franklin*, 284 F. App'x 701, 703 (11th Cir. 2008) (same).

Byrd then read the *Miranda* warnings to the Ingrams, although they did not acknowledge the warnings because they were still insisting the dog did not alert. During or after the dog's alert, dispatch informed Deputy Byrd that the Ingrams' license and vehicle information were valid. Deputy Tector searched the vehicle and found $4,003 in loose currency inside the center console, and 1.715 kilograms (3.77 lbs.) of powder cocaine in a duffle bag in the trunk. The Ingrams were then placed in handcuffs and arrested. They now seek to suppress the cocaine found in their vehicle.

## II.    Discussion

Kenneth and Kadeem Ingram have moved, pursuant to Federal Rule of Criminal Procedure 12(b)(3), for suppression of evidence and statements obtained by law enforcement during and after a traffic stop that resulted in their arrests in this case. *See* ECF Nos. 182, 183. More specifically, the Ingrams argue that law enforcement unconstitutionally extended the scope and duration of the traffic stop, without reasonable suspicion of criminal activity, by ordering them out of their vehicle and conducting a dog sniff.[6] Kenneth Ingram also argues the traffic stop was

---

[6] In their briefs, the Ingrams added that their being placed in handcuffs somehow extended the scope and duration of the traffic stop. However, Deputy Byrd testified that the Ingrams were not handcuffed until after the cocaine was discovered in their vehicle and they were formally arrested. There is no evidence to the contrary. Accordingly, any suggestion that handcuffing unlawfully prolonged the stop is moot.

Case No. 3:19cr113/MCR

unlawful at its inception because there was no legal basis for it, and that the dog did not alert to the Ingrams' car.

## A. Lawfulness of the Traffic Stop

The Court first addresses the lawfulness of the traffic stop at its inception. Traffic stops are seizures under the Fourth Amendment, *Delaware v. Prouse*, 440 U.S. 648, 653 (1979), and are constitutionally reasonable only when supported by either probable cause to believe a traffic violation has occurred or reasonable suspicion of criminal activity, *see United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008). An officer's underlying "motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment." *See United States v. Simmons*, 172 F.3d 775, 778 (11th Cir. 1999) (quoting *Whren v. United States*, 517 U.S. 806, 812 (1999)).

In this case, Deputy Byrd had probable cause to stop the Ingrams' vehicle for speeding because he personally observed the vehicle traveling on Interstate 10 in a posted 70 mph zone and, at the time, his radar device measured the vehicle's speed at 83 mph. *See United States v. Cooper*, 133 F.3d 1394, 1398 (11th Cir. 1998) ("[L]aw enforcement may stop a vehicle when there is probable cause to believe that the driver is violating any one of the multitude of applicable traffic . . . regulations relating to the operation of motor vehicles.") (internal marks omitted). The deputy's subjective motivations for finding a reason to stop the vehicle are legally irrelevant.

*See Whren*, 517 U.S. at 812; *Simmons*, 172 F.3d at 778. Because Deputy Byrd stopped the Ingram's vehicle only after having probable cause to believe that the driver had committed the traffic violation of speeding, the traffic stop was lawful under the Fourth Amendment.[7]

### B.    Scope and Duration of the Traffic Stop

The Court next considers whether law enforcement unconstitutionally extended the scope and duration of the traffic stop by ordering the Ingrams out of their vehicle, conducting a dog sniff and handcuffing them. "[T]he duration of [a] traffic stop must be limited to the time necessary to effectuate the purpose of the stop." *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001). Generally, this means that a stop based on a traffic violation "may not last any longer than necessary to process the . . . violation."[8] *Id.* (internal marks omitted). However, an officer may prolong a traffic stop for a reasonable amount of time beyond that which is necessary to process the traffic violation "if he has articulable suspicion of other

---

[7] For the reasons stated in Section B(2)(b) of this Order, the collective knowledge of the law enforcement officers involved in this operation also provided reasonable suspicion that the Ingrams were illegally transporting cocaine at the time, which provided an independent constitutional basis for the traffic stop in this case. *See United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008) (investigatory stops permissible on "reasonable suspicion of criminal activity").

[8] Tasks related to processing a traffic violation include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). Similarly, in the interest of the officer's safety, officers may prolong a traffic stop while awaiting the results of a criminal history check that is part of their routine traffic investigation. *United States v. Purcell*, 236 F.3d 1274, 1278 (11th Cir. 2001).

illegal activity." *United States v. Boyce*, 351 F.3d 1102, 1106 (11th Cir. 2003). In those circumstances, the continued detention may last only as long as is reasonably necessary for the officer to "pursue[] a means of investigation likely to" confirm or dispel his suspicions about the criminal activity. *United States v. Street*, 472 F.3d 1298, 1306 (11th Cir. 2006).

### 1. Ordering the Ingrams Out of the Vehicle

There was no Fourth Amendment violation when Deputy Tector required the Ingrams to exit their vehicle. During a lawful traffic stop, officers may take steps that are reasonably necessary to protect their personal safety, including—"as a matter of course"—requiring a driver and passenger to exit the vehicle. *Maryland v. Wilson*, 519 U.S. 408, 415 (1997); *United States v. Gibbs*, 917 F.3d 1289, 1295 (11th Cir. 2019). Doing so does not *prolong* the stop; instead, it is *part of* the stop.

### 2. The Dog Sniff

Finally, the dog sniff in this case did not unlawfully prolong the traffic stop. A traffic stop "is unlawfully prolonged when an officer, without reasonable suspicion, diverts from the stop's purpose and adds time to the stop in order to investigate other crimes." *United States v. Campbell*, 970 F.3d 1342, 1355 (11th Cir. 2020). "That is, to unlawfully prolong, the officer must (1) conduct an unrelated inquiry aimed at investigating other crimes (2) that adds time to the stop (3) without

reasonable suspicion." *Id.* Here, only the second and third requirements are at issue.[9]

### a. Time Added to the Stop

Absent reasonable suspicion of other criminal activity, a traffic stop may "last no longer than is necessary to process the traffic violation." *Purcell*, 236 F.3d at 1277. In other words, the officer's "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015); *Campbell*, 970 F.3d at 1352. "Prolonging" the stop means *any* extension of time, no matter how small. *Campbell*, 970 F.3d at 1354 (stating that it does not matter whether a stop is prolonged by eight minutes, or thirty seconds, because "the Supreme Court was clear that the length of time is immaterial").[10]

Here, the evidence establishes that the dog sniff did not add time to the traffic stop. Deputy Byrd performed the inquiries necessary to process the traffic violation, including verifying the validity of the Ingrams' vehicle and driver's licenses by radio

---

[9] It is undisputed that using a dog to search for contraband (i.e., a dog sniff) is not a task that can be "fairly characterized as part of [an] officer's traffic mission." *See Rodriguez*, 575 U.S. 348, 349, 356; *Campbell*, 970 F.3d at 1352. Rather, a dog sniff is a police inquiry "aimed at detecting evidence of ordinary criminal wrongdoing." *Rodriguez*, 575 U.S. at 356; *Campbell*, 970 F.3d at 1352.

[10] At one time, the Eleventh Circuit recognized a *de minimis* exception of sorts—where prolonging a stop was unlawful only if the stop was prolonged unreasonably. *See Campbell*, 970 F.3d at 1353-54 (citing *United States v. Griffin*, 696 F.3d 1354 (11th Cir. 2012)). The Supreme Court rejected both the reasonableness standard and the *de minimis* rule in *Rodriguez*. *See id*.

through dispatch.  It took approximately 10 to 15 minutes for dispatch to advise Deputy Byrd that the vehicle and driver's licenses were valid.  In that time, Deputy Tector conducted the dog sniff.  There is no evidence that the Ingrams were detained beyond the time that the tasks tied to the traffic infraction would have otherwise been concluded had the dog sniff not occurred.  To the contrary, because there were two deputies present on the scene, one of them was able to conduct an unrelated criminal inquiry without adding time to the stop.  The Court thus finds the dog sniff did not unlawfully prolong the traffic stop.

### b. Reasonable Suspicion of Other Criminal Activity

Even if the deputies had prolonged the traffic stop in order to conduct the dog sniff, the additional detention was supported by a reasonable suspicion of criminal activity.  An officer may prolong a traffic stop for a reasonable amount of time beyond that which is necessary to process a traffic violation if he has reasonable and articulable suspicion of other illegal activity.  *Boyce*, 351 F.3d at 1106.  In those circumstances, the continued detention may last only as long as is reasonably necessary for the officer to "pursue[] a means of investigation likely to" confirm or dispel his suspicions about the criminal activity.  *Street*, 472 F.3d at 1306.

Reasonable suspicion exists when an officer "ha[s] a particularized and objective basis for suspecting the person stopped of criminal activity."  *Campbell*, 912 F.3d at 1349.  To determine whether a suspicion is reasonable, courts evaluate

the "totality of the circumstances surrounding the stop, including the collective knowledge of all officers involved in the stop," *United States v. Bishop*, 940 F.3d 1242, 1249 (11th Cir. 2019), so long as the officers "maintained at least a minimal level of communication during their" operation, *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985).  The officers with the actual knowledge giving rise to reasonable suspicions need not have communicated that knowledge to the detaining officer for the collective knowledge doctrine to apply.  *United States v. Kapperman*, 764 F.2d 786, 791 n.5 (11th Cir. 1985).  The "minimal communication" requirement is met where law enforcement officers are functioning as a team and one officer asks or instructs another officer to take some action.  *See United States v. Cotton*, 721 F.2d 350, 351-52 (11th Cir. 1983), *abrogated on other grounds by Batson v. Kentucky*, 476 U.S. 79 (1986).

Under the totality of the circumstances here, the Court concludes that reasonable suspicion would have justified extending the stop and conducting the dog sniff.  The traffic stop was the culmination of the DEA and Sheriff's Office's months-long joint investigation into the Ingrams' drug trafficking activities in Walton County.  Based on all of the evidence collected during that time, the investigators had an objectively reasonable basis for believing that the Ingrams frequently rented cars and made trips to Miami to obtain kilogram quantities of cocaine from a supplier located there, and that they—and others—distributed that

cocaine in the Walton County area. Through geolocation, wire and physical surveillance, investigators also had sufficient reason to believe that the Ingrams' trip to Miami on July 10, 2019 likewise was for the purpose of obtaining a fresh supply of cocaine for distribution in and around Walton County.

On July 13, 2019, the DEA coordinated physical surveillance of the Ingram's rental vehicle on Interstate 10 with the Sheriff's Office prior to the traffic stop, communicated with the Sheriff's Office during the stop, and directed the deputies to stop the Ingram's vehicle if it a traffic violation occurred. Deputy Byrd did not know the details of the joint investigation; however, the DEA and Sheriff's Office investigators told him the Ingram's vehicle may be carrying a substantial amount of cocaine and he knew in advance that his role in the operation was to stop the vehicle if he observed a traffic violation. Moreover, he communicated with the DEA and Sheriff's Office investigators by radio before, during and after the traffic stop. Consequently, the collective knowledge of all the law enforcement officers involved in the operation is considered in determining whether there was reasonable suspicion to extend the traffic stop. *See, e.g., United States v. Marsh*, 663 F. App'x 888, 893 (11th Cir. 2016) (applying collective knowledge doctrine where arresting officer did not have all the knowledge forming the basis for probable cause but was in radio communication with DEA agents who did have sufficient knowledge); *Kapperman*, 764 F.2d 786, 795 n.5 (11th Cir. 1985) (same). Here, the collective knowledge of

Case No. 3:19cr113/MCR

the DEA agents, Sheriff's Office investigators and Deputy Byrd is more than sufficient to establish "a particularized and objective basis for suspecting" the Ingrams were transporting cocaine at the time of the traffic stop. *See Campbell*, 912 F.3d at 1349. Consequently, the Court finds the deputies had reasonable suspicion that criminal activity was afoot and were justified in briefly extending the traffic stop while conducting a dog sniff to confirm or dispel that suspicion. Thus, duration of the traffic stop was well within the bounds of the Fourth Amendment.

### C.    Reliability of the Canine Sniff

In his motion, Kenneth Ingram only argued that Deputy Tector's dog did not actually alert to the presence of narcotics in the Ingram's vehicle. However, at the suppression hearing, he offered no *evidence* about the dog or the circumstances surrounding the alert. Consequently, the Government's evidence—i.e., that Deputy Tector's drug-detection dog positively alerted to the Ingram's vehicle—stands uncontested. In other words, there is no evidence that the dog did not alert.

Briefly, it is well-established that an alert by a trained and certified drug-detection dog may provide probable cause for a search. *Florida v. Harris*, 568 U.S. 237, 247-48 (2013); *United States v. Tamari*, 454 F.3d 1259, 1265 (11th Cir. 2006) ("[P]robable cause arises when a drug-trained canine alerts to drugs."). Absent evidence to the contrary, courts may "presume" that the dog's alert is reliable where the dog's reliability is formally certified by a "bona fide" organization, or where he

"has recently and successfully completed a training program that evaluated his proficiency in locating drugs." *See Harris*, 568 U.S. at 247; *United States v. Burrows*, 564 F. App'x 486, 492 (11th Cir. 2014). A defendant must have the opportunity to challenge the reliability of the dog overall or of a particular alert by cross-examining a testifying officer, showing that the standards of the dog's certification or training program are too lax, examining the dog and handler's history in the field, or identifying unique circumstances about a particular alert that would damage its reliability. *Harris*, 568 U.S. at 247; *United States v. Rodriguez*, 762 F. App'x 938, 942 (11th Cir. 2019). If the government's evidence is uncontested, a court should find the dog's alert reliable. *Id*. at 248.

Here, the uncontested evidence establishes that a certified drug-detection dog positively alerted to the Ingram's vehicle. Kenneth Ingram has offered no evidence or even argument that the dog was inadequately trained, that Deputy Tector cued or otherwise manipulated the dog into an alert, or that other circumstances negated the reliability of the dog's alert. On this record, the Court thus proceeds with the presumption that the dog's positive alert was reliable and provided probable cause to search the vehicle.

### III.   Conclusion

Based on the foregoing, the Court concludes that no Fourth Amendment violations occurred in this case because: (1) the traffic stop was justified at its inception based on probable cause to believe the Ingrams' vehicle had committed a traffic violation and reasonable suspicion that the vehicle was transporting illegal narcotics; (2) requiring the Ingrams to exit their vehicle was within the scope of the traffic stop; (3) the dog sniff did not unconstitutionally prolong the stop; (4) even if the dog sniff had prolonged the stop, the additional time was justified by reasonable suspicion that the Ingrams were transporting cocaine; and (5) the dog's positive alert to the presence of narcotics in the Ingrams' vehicle was reliable and provided probable cause to search the vehicle. Accordingly, the Motions to Suppress, ECF Nos. 182 and 183, are **DENIED**.

**DONE AND ORDERED**, on this 19th day of October, 2020.

*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**